IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARIANNE KREASON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:09-CV-1040-N |
| | § | |
| TRISTAR PRODUCER SERVICES OF TEXAS, L.P., | § § | |
| | § | |
| Defendant. | § | |

## ORDER

This Order addresses Defendant Tristar Producer Services of Texas, L.P.'s, ("Tristar") motion for summary judgment [7]. Because Kreason fails to raise a fact issue regarding whether Tristar's nondiscriminatory explanations for her dismissal are pretext, the Court grants summary judgment in Tristar's favor. Accordingly, the Court further denies as moot Kreason's motion to strike Tristar's reply [13].

### I. ORIGINS OF KREASON'S EMPLOYMENT DISCRIMINATION CLAIMS

Tristar "buys gas from a large number of suppliers and sells the gas to a limited number of marketers, co-ops, and industrial customers." Herrmann Aff. at 1. For over a decade, Kreason worked at Tristar in various capacities, including as Tristar's agent to New Mexico Natural Gas ("New Mexico"). In 2005, Tristar bought a controlling interest in New Mexico, subsequently renamed Mid-States Energy, L.P. ("Mid-States"). Mid-States "purchas[es] gas from a limited number of gas wholesalers and sell[s] the gas to a large number of various customers such as manufacturers, universities, apartment complexes, and

retail stores." Kelly Aff. at 1. Larry Kelly served as New Mexico's Chief Operating Officer ("COO") and remained in that position after the company's rebranding.

In the summer of 2005, Kreason attended a trade conference in California in her capacity as agent to New Mexico. Kelly also attended the conference. According to Kreason, she and Kelly attended a function one evening and drank an unknown number of alcoholic beverages. Kelly eventually invited Kreason to his hotel room. Kreason accepted, thinking that Kelly wanted to discuss business between New Mexico and Tristar. Instead, Kelly "lewdly propositioned" her by making sexually suggestive comments and attempting to kiss her. Kreason Dep. 70:9-76:14. Kreason declined Kelly's alleged advances, but did not tell anyone about the incident for fear of jeopardizing her job. Kreason Aff. at 2.

Shortly thereafter, Tristar obtained its controlling interest in New Mexico. In the resulting shuffle, Tristar reassigned Kreason to work in "a relatively simple accounting job" that, although providing her the same base salary as her previous position, made her ineligible for certain additional compensation. Kreason Aff. at 3. In her new position, Kreason assumed responsibility "for the daily booking of gas transactions for Tristar." Herrmann Aff. at 3. Kreason alleges that Tristar gave no explanation for what she considered a "demotion," but she suspects that the reassignment stemmed at least in part from Kelly's decision to move newly-formed Mid-States's Tristar-related operations from Richardson – where Kreason maintained her office – to Arlington, Texas. Kreason Aff. at 3. Although he never suggested as much, Kreason believed that Kelly acted out of a desire to punish her for rejecting him in California. Kreason Dep. 73, 76.

By early 2007, Tristar had hit hard times. Its operating revenues had decreased, prompting Tristar's leadership to consider a reduction in force. Herrmann Aff. at 3; *see also* Herrmann Aff. Ex. 1 & 2 (Tristar financial statements). This included giving then-fifty-two year old Kreason's duties to Tristar's office manager, a sixty-plus year old woman, and offering Kreason and another Tristar employee, Jared Patterson, the opportunity to work at Mid-States for a trial period on Tristar's dime. Herrmann Aff. at 3. Although this meant that Kreason would work directly under Kelly, the new opportunity excited her because she anticipated selling natural gas on the lucrative Atmos pipeline; indeed, Kreason initially saw the assignment as a reward for her years of service to Tristar. Pl.'s Answers to Def.'s First Interrogs. at 5-6. The arrangement allowed Kreason to continue earning her Tristar base salary, but it did not make her eligible for bonuses or commissions despite the position's sales-based nature. Kreason Dep. 57-62.

Kreason, however, was dismayed to learn that Kelly had already assigned the Atmos pipeline to a younger and ostensibly less-experienced Mid-States employee, Jessica Byrd. Rather than sharing responsibility for the Atmos line, Kreason instead found herself assigned to the Texas Gas Service ("TGS") Pipeline located in the Austin area. She believed that the TGS line provided fewer opportunities for advancement, given its relatively more limited scope than the Atmos line, and presented substantial difficulties due to its poorly maintained records. Kreason Aff. at 3-5. Nonetheless, Kreason began organizing the TGS line's long-neglected records in an effort to pin down the status of current customers and lay the groundwork for future sales. The work required almost all of Kreason's attention, and she

would have appreciated some extra help. But, to Kreason's chagrin, when Patterson joined Mid-States a few months later, Kelly assigned him to procure new Atmos line customers.

After over six months on the job, Kreason had yet to make any sales. Mid-States ended her trial period. Kelly divided responsibility for the TGS line between Byrd and Patterson, who subsequently made several sales over the following months. Kelly Dep. at 3. Tristar, however, had yet to turn around its finances and "did not have a non-sales position available." Herrmann Aff. at 4. Accordingly, the company terminated Kreason's employment, providing only this force-reduction explanation. Tristar continued to pay Kreason's salary and benefits for several months. App. to Pl.'s Resp. [10] at 22. Although Tristar gave the same explanation to the Texas Workforce Commission when supporting Kreason's application for unemployment, *id.* at 8-12, it now claims that the decision was also based on Kreason's poor performance at Mid-States. Herrmann Aff. at 4.

Kreason filed this action alleging that Tristar impermissibly dismissed her because of sex and age in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000(e) *et seq.*, and the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621. Kreason argues that Tristar's stated reasons for her termination are merely pretextual. The parties have engaged in discovery, and Tristar now moves for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Courts may grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Courts, however, need not sift through the record in search of triable issues. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

**III. KREASON FAILS TO CONTRADICT TRISTAR'S NONDISCRIMINATORY EXPLANATION**

To prevail, Kreason must ultimately demonstrate, by a preponderance of either direct or circumstantial evidence, that sex was a "motivating factor"in and age the "but-for" cause of her termination.[1]  *See Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009) (ADEA); *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (Title VII).  Because Kreason's case relies on circumstantial evidence, the well-known *McDonnell Douglas* balancing test applies to both her Title VII and ADEA claims.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (noting that, pending contrary guidance from the Supreme Court, the Fifth Circuit continues to apply the *McDonnell Douglas* framework to ADEA claims (citing *Gross*, 129 S. Ct. at 2349 n.2)).

Under *McDonnell Douglas*, Kreason bears the initial burden of establishing prima facie cases of sex and age discrimination.  Once accomplished, the burden to produce – but not persuade – shifts to Tristar, who must provide a nondiscriminatory explanation for its actions.  The burden then shifts back to Kreason to raise a fact issue regarding whether Tristar's stated reasons for dismissal are pretext.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) and *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).

---

[1]*See* 42 U.S.C. § 2000e-2(m) (providing that "an unlawful employment practice is established" under Title VII "when . . . sex . . . [is] a motivating factor for any employment practice, even though other factors also motivated the practice.); 29 U.S.C. § 623(a)(1) (prohibiting discrimination "because of" age).

ORDER – PAGE 6

In light of the Supreme Court's decision in *Desert Palace*, the Fifth Circuit uses a "modified *McDonnell Douglas* approach" in the Title VII context, which recognizes a "mixed-motive" alternative to the pretext-based last step. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004), *invalidated in part by Gross*, 129 S. Ct. 2343 (precluding mixed-motive analysis in ADEA cases). This modified approach provides that "[i]f a plaintiff demonstrates that [a Title VII protected characteristic] was a motivating factor in the employment decision, it then falls to the defendant to prove 'that the same adverse employment decision would have been made regardless of the discriminatory animus.'" *Id.* (quoting *Mooney v. Aramco Serv. Co.*, 54 F.3d 1207, 1216-17 & n.11 (5th Cir. 1995)). Thus, a Title VII plaintiff may use two methods to establish the existence of a genuine issue of material fact after a defendant has provided a nondiscriminatory reason for the adverse employment action: "'either (1) that the defendant's reason *is not true*, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, *while true*, is only one of the reasons for its conduct and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motive[s] alternative).'" *Id.* (quoting *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp. 2d 854, 865 (M.D.N.C. 2003)) (emphasis added).

To make a prima facie case of sex discrimination, Kreason must show that "(1) she is a member of a protected class; (2) she was qualified for the position she sought; (3) she suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably." *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006);

*Urbano v. Cont'l Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1998)). For her ADEA claim, Kreason "'must show that (1) [s]he was discharged; (2) [s]he was qualified for the [sought-after] position; (3) [s]he was within the protected class at the time of discharge; and (4) [s]he was either i) replaced by someone outside of the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of h[er] age.'" *Jackson*, 602 F.3d at 378 (citing *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007)).

For summary judgment purposes, Tristar concedes that Kreason has made prima facie cases of both sex and age discrimination. Tristar, however, maintains that it terminated Kreason's employment for legitimate force-reduction reasons. Accordingly, the Court turns to address whether Kreason raises a fact issue on pretext.

Kreason contends that Tristar's explanations for her dismissal are pretext because in this action it enumerated three additional reasons for its actions beyond its original force-reduction rationale. In his affidavit, Tristar's Senior Vice President explained that he

> terminated [Kreason] because: (1) she was not making calls on existing and prospective customers, which was her primary job function as a sales representative; and because she was not making calls, she was not making new sales; (2) instead of making calls, she spent seven months spending the vast majority of her time getting the files organized, which was much too long to complete that task; (3) she refused to go to Austin to make sales calls despite being instructed to do so on several occassions; and (4) by the end of September 2007, Tristar's operating margins had continued to decline, and for that reason, Tristar did not have a non-sales position available for Ms. Kreason.

Herrmann Aff. at 4. Kreason believes that this "changing explanations" approach demonstrates bad faith and suggests impermissible discrimination by Tristar. *See Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002).

ORDER – PAGE 8

As an initial matter, Kreason misunderstands the nature of Tristar's explanation. It does not provide a changing rationale, but rather two separate reasons. As Kreason acknowledges, Tristar had hit a financial rough patch and needed to take corrective action, which included a force reduction. *See* Kreason Dep. 156:20-157:4.[2] Instead of simply letting Kreason go, however, Tristar decided to give her and another Tristar employee the opportunity to compete for permanent sales-related jobs at Mid-States, a move that Kreason at first happily accepted despite her alleged history with Larry Kelly. Several months later, however, Mid-States released Kreason for the first three reasons enumerated by Herrmann, which relate solely to Kreason's job performance at Mid-States – not Tristar. Because it still did not have a place for Kreason, Tristar then terminated her employment.

Rather than shifting, then, Tristar has provided a consistent explanation throughout the dispute. That it now discloses Mid-States's job performance-related reasons for sending Kreason back to Tristar does not raise a fact issue on pretext concerning Tristar's force-reduction explanation. Accordingly, the Court declines to infer an illegitimate motive behind Tristar's proffered explanation and holds that Tristar has sufficiently set forth a creditable nondiscriminatory reason for Kreason's dismissal.[3] *Reeves*, 530 U.S. at 147.

---

[2]"Q: One of your answers to interrogatories says that, 'I do know that Tristar was not making as much money as necessary and that they had to do something.' What do you mean by that? Do you recall saying that? A: They're pretty open about what the financial status was with the employees, and – we knew that the company wasn't making – it was a bad time for the company. Yes. Q: At the time you were terminated? A: Yes."

[3]That the same Tristar leadership initially hired Kreason and were members of the same ADEA-protected class only bolsters this conclusion. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) ("same actor" and "same class" inference against discrimination and pretext), *limited in part on other grounds by Reeves*, 530 U.S. 133 and *Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000); *see also Faruki v. Parsons*

Under the Fifth Circuit's modified *McDonnell Douglas* framework, Kreason thus has the burden to produce competent summary judgment evidence showing either pretext for her Title VII and ADEA claims or mixed-motive in her Title VII claim. Based on the record before the Court, Kreason has failed to contradict Tristar's nondiscriminatory explanation on both accounts.

Three employment actions potentially could have served as the basis for Kreason's complaint against Tristar: the reassignment from serving as agent to New Mexico to an accounting position, the trial period transfer from Tristar to Mid-States, and the termination of employment following Kreason's release from Mid-States. But, Kreason neither cognizably complains of the accounting and Mid-States loan assignments nor challenges the legitimacy of Tristar's force-reduction rationale.[4] Indeed, beyond her apparent hope that the Court infer discriminatory intent on Tristar's part based on Kelly's alleged post-rejection animus, Kreason points to no evidence showing that sex or age discrimination lay at the heart of, or played a motivating role in, these decisions.[5]

---

*S.I.P., Inc.*, 123 F.3d 315, 321 (5th Cir. 1997).

[4]Kreason argues in her brief that she did not know that the Mid-States job was for a trial basis, would place her under Larry Kelly, or even send her to Mid-States, citing certain sections of her affidavit. *See* Pl.'s Resp. Br. [10-2] at 9 (citing Pl.'s App. at 3 ¶¶ 11-12 (Kreason Aff.)). Kreason's affidavit and deposition testimony, however, flatly contradict those claims. In the affidavit, Kreason explains only that she thought the Mid-States job would result in her assignment to the Atmos pipeline. *See also* Kreason Dep. 45:10-13 ("Q: When you were assigned by Tristar in March '07, did they tell you, though, you were to work for Larry Kelly? A. Yes.") (emphasis original); Pl.'s Answer to Def.'s First Interrogs. at 5-6.

[5]"Q: . . . . As far as you knew when you were assigned to that simple accounting job, was there any other reason you got that job other than the fact that Larry Kelly no longer wanted you around? A: They told me he wanted to handle that [account] in his Arlington office. That was the reason. Q: Did that, based upon your experience, make business sense

ORDER – PAGE 10

Instead, the record demonstrates that Kreason really complains of her assignment to the TGS pipeline at Mid-States and subsequent transfer back to Tristar.[6] Both of those decisions were made by Mid-States's COO, Larry Kelly.[7] And, although it's possible that

---

at all? A: It wasn't up to me. [But,] [y]es. . . . . I guess it did. . . . . It sounded like a good reason." Kreason Dep. 91:6-25.

"Q: Did you at any point ever ask Kevin Herrmann or [Tristar President] Bart Simmons about your being assigned to Mid-States? A: No it made sense to me." *Id.* at 93:20-22.

[6]"Q: . . . . Why do you feel that your termination was based upon the fact you were discriminated due to sex?" A. Because when I left [Mid-States], a man was continuing my job that I was doing." Kreason Dep. 45:21-25 (emphasis original).

"Q: Anything else you want to tell me of a factual nature of why you believe your termination was based upon your being discriminated against by your sex? A: Just the fact that [at Mid-States] I was assigned this [TGS] pipeline in Austin versus the Atmos pipeline, which is pretty much all over Texas, and . . . that's the pipeline that Jared [Patterson] was working, Jared and Jessica [Byrd]." *Id.* 50:15-21 (emphasis original).

"Q: . . . . Tell me factually, why is it you think your firing in October of 2007 was due to the fact that you were . . . . a 52-year-old person? A: Because the two young people who had the same amount of experience doing what we were doing [at Mid-States] were still there doing that job, and I, who had a decade more experience, two decades, whatever – I'd been in the industry . . . since 1981. I had all this knowledge, and . . . I'm not there anymore. Q: Any other reason . . . .? A: I don't know how many ways I can say this. I'm gone, and they're still there." *Id.* at 131:16-132:6.

[7]"Q: Did you ever discuss with [Larry Kelly] the fact that your expectation was you were going to get the Atmos account? A: I came back to Kevin Herrmann. [He] was my Tristar boss. Q: So when did you go talk with Kevin Herrmann? A: When I got back to the office, which was the next day, I believe, I said, ['][Kelly] wants me to do [TGS]. I'm not doing Atmos like we thought.['] And Kevin said,[']Well, however [Kelly] wants to handle it.[']" Kreason Dep. 55:17-56:1.

"Q: Any other factual reason for why you believe your termination was due to your being discriminated against because of your sex? A. I don't know if – legally if you can refer to the incident that happened [between me and Kelly] in California as part of that answer." *Id.* 47:5-10 (emphasis original).

"Q: All right. What is it you're critical of that [Patterson] got the Atmos account and you didn't? Why do you think that's unfair or you were being discriminated against? A: Because I think that in Larry Kelly's mind, he thought that an attractive young person might do better in that position than me. But that's not really the reason that I think that they were assigned that. I think it – I think he had ulterior motives. Q: Who had ulterior motives? A:

ORDER – PAGE 11

Kreason has a claim against Mid-States, she failed to name Mid-States as a defendant to this action or to bring a separate suit.[8]  Thus, the propriety of Kelly's decisions is not properly before the Court, and Kreason points to no evidence suggesting that Tristar either directed Kelly to act on a discriminatory basis or knowingly ratified Kelly's decision to do so.

## CONCLUSION

Because Kreason fails to raise a genuine issue of material fact sufficient to show pretext or mixed-motive behind Tristar's nondiscriminatory explanation for her dismissal, the Court grants Tristar's motion for summary judgment.  Accordingly, the Court denies as moot Kreason's pending motion to strike Tristar's reply.

Signed November 18, 2010.

_____
David C. Godbey
United States District Judge

---

Larry."  *Id.* at 51:6-16 (emphasis original).

  "Q: Can you tell me any other possible reason you would not have been assigned to that Atmos account by Mid-States other than the fact you think Larry Kelly wanted to get rid of you based on something that occurred two years before? . . . . A: He – he's known for hiring young people, and I think he may have thought Jessica would do a good job . . . His reputation is for liking to have young people."  *Id.* at 66:21-10.

  [8]Kreason may or may not have legitimate claims against Mid-States; the Court takes no position on the issue.

ORDER – PAGE 12